ARMOUR RESEARCH FOUNDATION, etc. and Minnesota Mining and Manufacturing Company, Plaintiffs-Appellants and Cross-Appellees,

v.

C. K. WILLIAMS & CO., Inc., Defendant-Appellee and Cross-Appellant.

ARMOUR RESEARCH FOUNDATION, etc., Plaintiff-Appellant and Cross-Appellee,

v.

TECHNICAL TAPE CORPORATION, Defendant-Appellee and Cross-Appellant.

Nos. 12701–12706.

United States Court of Appeals Seventh Circuit.

July 12, 1960.

On Petition for Rehearing Aug. 30, 1960.

Carlton Hill, Edward A. Haight, Chicago, Ill., Charles E. Feirich, Carbondale, Ill., William H. Abbott, St. Paul, Minn., Benjamin H. Sherman, Chicago, Ill., for Armour Research Foundation.

Carl S. Lloyd, Chicago, Ill., Henry Driemeyer, E. St. Louis, Ill., Robert D. Spille, Albert C. Johnston, New York City, Marcus A. Hollabaugh, Washing-

ton, D. C., Samuel W. Kipnis, Chicago, Ill., for C. K. Williams & Co. and Technical Tape Corp.

Before HASTINGS, Chief Judge, DUFFY, Circuit Judge, and MERCER, District Judge.

DUFFY, Circuit Judge.

Plaintiffs claim infringement of Camras Patent No. 2,694,656 issued on November 16, 1954, on an application filed July 25, 1947. The patent relates to magnetic recording, popularly known as "tape recording." The first sentence of the patent states: "This invention relates to permanent magnet material and to a method of making the same." The patent explains this magnetic material is then impregnated or coated on a non-magnetic carrier to produce a magnetic impulse record member.

The Camras patent in suit was issued to Armour Research Foundation of Illinois Institute of Technology (Armour). Plaintiff Minnesota Mining & Manufacturing Company (3M) is the licensee under the patent, and has the exclusive right to grant sub-licenses. Defendant C. K. Williams & Co., Inc. (Williams) produces oxides for magnetic recording tape. Defendant Technical Tape Corporation (Technical Tape) uses those oxides in its production of magnetic recording tape.

Six claims are relied upon by plaintiffs (3, 8, 10, 14, 25 and 26). Claims 8, 10 and 14 call for methods of making "permanent magnetic material" or "oxides." Claim 3 refers to a ferromagnetic iron oxide material adapted to form an element of a magnetic impulse record member. Claim 25 refers to ferromagnetic oxide selected from a group consisting of synthetic ferrosoferric oxide and of a synthetic gamma ferric oxide, adapted to form an element of a magnetic impulse record member. Claim 26 provides: "A magnetic impulse record member having a non-magnetic carrier and a coating adherently bonded thereto of a binder and magnetic material, said magnetic material being the ferromagnetic iron oxide defined in Claim 25, and having a $B_r$

versus H characteristic that rises most rapidly at fields between 200 and 600 oersteds and relatively slowly at fields between 0 and 200 oersteds and at fields above 600 oersteds."

It is interesting to note that there were no "record member" claims in the Camras application between November 29, 1948 when the first group of such claims was cancelled after rejection, and April 29, 1954, a period of about $5\frac{1}{2}$ years.

Williams is charged with infringing claims 3, 8, 10, 14, 25, and contributory infringement of claim 26. Technical Tape is charged with infringement of claims 3, 25 and 26.

The District Court devoted four weeks to hearing and considering the extensive trial testimony. The oral testimony of sixteen witnesses was heard. The deposition testimony of ten other witnesses was considered. The trial court also had the advantage of courtroom demonstrations. The District Court prepared a detailed and carefully considered opinion which, with findings of fact and conclusions of law, may be found in 170 F. Supp. 871.

The Court found 1) that to a person skilled in the art, the magnetic iron oxide and method of producing it claimed in the patent were disclosed by several prior art references; 2) that all of the claims including the record member claims are lacking in invention, and the record member claims are not proper combination claims; and 3) that the claimed oxide was known, used and placed on sale in one instance, and the oxide was in public use in another, more than a year prior to the filing of the Camras application.

The Court dismissed the complaints in the consolidated actions. The Court also dismissed the two counterclaims of defendant Williams. One was for a declaratory judgment holding the patent invalid and not infringed. Although this counterclaim was dismissed, it was, in effect, sustained by the Court's holding of invalidity of the patent in suit. The second counterclaim alleged misuse of

the patent and asserted violation of the antitrust laws. Williams has cross-appealed from the dismissal of its counterclaims, and both defendants cross-appealed from a part of the judgment offsetting costs and failing to award attorneys' fees.

The art of magnetic recording is based upon the fact that a magnetic member (magnetic impulse record member) may be varyingly magnetized to record a varying electric current signal, such as from a microphone, which is sent through the winding of an electromagnet when said member is moved across a pole of the magnet. For playback, the member so magnetized is, in turn, moved across the pole of an electromagnet to generate a varying electric current in the winding thereof, so the signal originally recorded may be reproduced. In order to suppress background noise and to produce a better response, a bias current is ordinarily employed to impress a bias field on the signal field.[1]

Initially, commercial magnetic recorders in the United States used wire as a recording medium. As early as the 1930's magnetic recorders were used in Germany, where tape was used as the recording medium. The tape was coated or impregnated with magnetic iron oxide. Immediately following World War II, the Brush Development Company of Cleveland, started production of a magnetic recorder known as the "Soundmirror." It used a tape with a low coercive force magnetic oxide.

While the work on the Soundmirror was going on, Indiana Steel Products Company produced a tape recorder using a tape with high coercive force (about 250 oersteds) magnetic powder having particle sizes in the one micron range. After examining the Indiana Tape Recorder, Armour negotiated in an effort to obtain exclusive rights to the Indiana machine and medium. Indiana refused to commit itself to an exclusive arrangement. After the introduction of the *Brush* tape recorder, Armour set out to make a tape recorder of its own that "would use the same basic ideas as are now employed in our wire recorders" and planned to bring Indiana under an Armour's license agreement.

In 1945, Camras began extensive experimentation which plaintiffs claim led to the invention of the patent in suit. Plaintiffs say the patent in suit discloses and claims an improved magnetic recording tape; improved magnetic iron oxides which constitute the magnetic material of the tape; and methods assuring the production of such oxides embodying those magnetic and physical characteristics found by Camras to be necessary to achieve the improvements named.

All the twenty-six claims of the patent have one characteristic in common. They call for a "synthetic" magnetic iron oxide powder of the well-known classes of ferrosoferric oxide, $Fe_3O_4$, and gamma ferric oxide, $Fe_2O_3$, which is characterized as having a coercive force of at least 200 oersteds.[2] Although plaintiffs several times emphasized that the iron oxide powder was synthetic, the term "synthetic" was not incorporated into the claims until more than four years after the date of the patent application. The word "synthetic" is nowhere found in the specification.

Plaintiffs place great stress on what they call the "criteria" of the patent. They say that after Camras had made and tested a large number of tapes, certain magnetic criteria were developed which, combined with the pyhsical criteria as to particle, size and shapes of the oxides enabled Camras to show how to make a superior magnetic recording

1. Bias is a magnetic field added to the magnetic field of the signal being recorded, in order to obtain increased fidelity in recording.

2. Coercive force, Hc, characterizes the resistance of a magnet to demagnetization.

In magnetic recording, it is normal to use a saturation field of 1000 oersteds' intensity. The term "oersted" indicates a modern unit of magnetic field strength applicable to magnetic fields in free space such as air. This unit was formerly called the gauss.

tape capable of faithfully recording and reproducing high frequency notes at slower tape speeds than previously used.

Plaintiffs assert important criteria of the patent are: 1) a relatively high coercive force of 200 to 550 oersteds; 2) gentle slope of the lower bend of the $B_r$ versus H curve [3] to a point about 250 gauss where the curve begins to rise rapidly; 3) a rapid rise from 250 to 600 oersteds; 4) a high remanence of above 500 gauss, and a $B_{fm}/B_r$ ratio of less than 3 to 1; 5) a synthetic material comprised preferably of particles of less than 1.5 microns and not more than 6 mircons in maximum dimension and consisting of acicular or elongated particles.

The patent discloses the close interrelationship between the oxides and the recording mechanism. The District Court stated this situation very well in the following language: "There is practically an inseparable tie between the recording machine and the media to be used therewith. A magnetic recorder is not complete nor operative to give its intended performance until the mechanism is supplied with media having the same form and magnetic characteristics of the media it was designed to use. The machine is tailored to use a recording media having particular characteristics. The media are manufactured to provide those characteristics."

Plaintiffs claim that after the commercial introduction of the Camras tape by 3M in 1947, it proved a great commercial success and supplanted tapes previously used. The testimony showed that by 1957, 3M sales of the tape covered by the patent exceeded $8,000,000 in value.

■ Many of the findings of the District Court on the question of validity were, in large part, based on testimony before the Court by expert, technical and fact witnesses. The tests and demonstrations gave the Court a keen insight as to the claims and contentions of the parties. Under such circumstances, we cannot consider the issues as though we were a *nisi prius* court. We have, many times, pointed out that under such circumstances, Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. is applicable, and we can only disregard such findings if they are clearly erroneous. Hazeltine Research, Inc. v. Admiral Corp., 7 Cir., 183 F.2d 953, 954–955; Armour & Co. v. Wilson & Co., 7 Cir., 274 F.2d 143, 156. We have frequently reminded the bar that factual matters in a patent case must be tried and decided by the trial judge in precisely the same manner as those of any other kind of a lawsuit, and the functions of this court of review are no different than they are in any other kind of a case. See Armour & Co. v. Wilson & Co., supra, at pages 152, 156.

From the prior work of others, Camras knew or is charged with knowing, the usefulness in recording media, of high coercive force qualities. He knew similarly the desirability of using in magnetic tape, magnetic iron oxide powders of very small and uniform particle size and high coercive force, and of using elongated powder particles including acicular magnetic iron oxides. Camras also had constructive if not actual notice of the various magnetic iron oxides including synthetic materials and methods of preparation as had been disclosed in literature pertaining to magnetic iron oxide.

The same prior publications disclosed that magnetic iron oxides showing the highest values of coercive force are obtained by the chemical reduction of ordinary ferric oxides (known as nonmagnetic red iron oxide, also called alpha ferric oxide) to ferrosoferric oxides (black iron oxide, $Fe_2O_3$, also called magnetite) at elevated temperatures, and that the ferrosoferric oxides so obtained show coercive force values of 200 oersteds or more by magnetic measurement.

These publications also disclosed that ferric oxide could be obtained by dehydrating alpha ferric oxide monohy-

**3.** This curve represents the residual or remaining magnetic characteristics left in the sample after the applied field has been reduced to zero.

drate, $Fe_2O_3H_2O$. That material inherently forms as fine acicular crystalline particles of less than 2 microns in size. These publications also described process conditions which produce oxides of high coercive force. *Inter partes* demonstrations were carried out at Easton, Pennsylvania, based on prior publications including the teachings of Williams and Thewlis. The trial court found that such demonstrations produced oxides identical in properties claimed by Camras as his product invention.

Another prior publication was published in Germany in 1936, and is known as the Kraeber & Luyken publication. It discloses methods by which iron oxides may be reduced and oxidized in order to provide certain magnetic properties. The District Court found that at the *inter partes* demonstrations at Easton, an oxide identical to Camras' oxide was produced by following the disclosures of this publication.

The trial court discussed United States Department of Interior, Bureau of Mines' Bulletin 425. This Bulletin dealt with magnetic separation of ores, and at page 136, teaches the effect of heat treatment on iron oxides. The trial court found the teachings in this article disclosed to one skilled in the art that in order to obtain a high coercive force oxide, reduction temperatures of between 220° to 550° C. must be followed, and that overheating will destroy these magnetic properties.

The District Court pointed out that although the Patent Examiner referred to pages 88 to 95 of Bulletin 425, apparently no consideration was given to page 136 where the effect of heat treatment on the iron oxides was disclosed. The Court found the Williams and Thewlis, the Kraeber and Luyken, and the Bureau of Mines' publications (to the extent indicated), anticipated the oxides claimed by Camras as his invention, and that these publications were not cited nor considered by the Patent Office as prior art publications.

Welo and Baudisch were prior workers in the field. Their article was published in 1934, and disclosed a method whereby synthetic magnetite may be obtained by the reduction of gamma monohydrate and alpha monohydrate. Plaintiffs seek to challenge the District Court's reliance upon this reference by saying the oxide particles were not shown to be "characteristically" acicular. An inspection discloses that many of the particles of Welo and Baudisch oxides are acicular. However, whether the oxides are predominantly acicular would seem to be immaterial. The use of oxides composed of acicular particles on recording tape was old. Camras admitted that the acicular form was not critical. This is also demonstrated by the fact that some of the claims in suit, such as 4 and 13, do not specify the shape of the particles at all.

The decision of the District Court on invalidity was based, in part, on the Johnson patent (British Patent No. 466,023) dated November 18, 1936. This patent is entitled "Improvement in the Manufacture and Production of Sound Record Carriers." The patent taught the use of synthetic magnetic iron oxides both $Fe_3O_4$ and gamma $Fe_2O_3$ in fine particle sizes of 1 micron or less, including synthetic oxides of acicular shape as a magnetic recording material on or in a nonmagnetic carrier (tape). The patent stated that such an oxide having a favorable remanence and high coercive force was especially suited for use in sound recordings to obtain faithful reproductions of speech and music at reduced tape speeds.

The Johnson patent did not state numerical values of magnetic property measurements, nor did it disclose any magnetic oxides or methods of preparing same. Instead, it referred in general terms to certain methods of preparing suitable oxides and stated such methods "are known *per se*." Workers were thus referred to the magnetic iron oxide art.

Plaintiffs argued that Johnson's reference to high coercive force meant force

less than 200 oersteds. However, by following the methods of preparing oxides which were "known *per se*," magnetic oxides showing coercive force values of 200 oersteds and higher could be obtained by anyone who wanted them.

The OSRD report No. 5325 of June 30, 1945, had described basic principles of the magnetic recording process, and had referred to the tendency of high coercive force in the recording media to favor reproduction of high frequency signals. It described the development of coated wire media showing coercive force measurements of 300 oersteds. It also mentioned that better results had been obtained with flexible tapes using synthetic magnetic iron oxides then available commercially, and which had particle sizes of less than 1 micron, and coercive force measurements of 100 to 200 oersteds.

■ We think and so hold, that the oxide and method claims of the Camras patent are clearly invalid over the prior art hereinbefore discussed. The same is likewise true of the record member claims especially in view of Johnson and the teachings of OSRD report 5325. In our view, the claims at issue of the patent in suit were fully anticipated by a number of the prior publications, and are completely lacking in invention over others. We hold there is credible evidence to support the Court's findings and conclusions with respect to the prior art.

The trial court held that a certain transaction hereinafter narrated which occurred in April, 1946, and in the period immediately following, amounted to a prior public use of the oxides in suit, and was a statutory bar to the validity of the patent.[4]

April, 1946, was more than a year prior to the filing date of the Camras patent. In that month, 3M disclosed to Armour a magnetic oxide tape and asked Armour if it was interested in the use of magnetic tape for recording. Armour advised 3M it had experimented with tapes using oxides having a considerably higher coercive force than those shown to Armour by 3M. A sample of Armour's tape was given to 3M which caused tests to be made of the oxide as coated on the tape. Thereafter, 3M requested and Armour furnished ten pounds of oxides for the use by 3M in coating tapes. This material was received by 3M prior to July 12, 1946, and was used in coating tapes. The trial court found as a fact that the oxides furnished by Armour to 3M were the same oxides later patented by Camras.

Plaintiffs argue that this transaction was merely an experimental use as contrasted with a public use. Plaintiffs argue Camras did not have suitable equipment for making rolls of tape and 3M made some small sample rolls which it sent to Camras for testing. Plaintiffs point out no money changed hands and urge that no commercial transaction was involved.

■ The question is not without difficulty. While a public use more than a year prior to the application date would defeat a patent, an experimental use would not. Whether the use by 3M was experimental, poses a very close question. It is apparent that the use by 3M of the oxides did have some aspects of an experimental use. In his testimony, Camras described the tapes as "experimental samples." None of the tapes were actually sold. The unused oxide was returned.

In Elizabeth v. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000, the use was held to be experimental and not an invalidating public use. There, the invention related to highway pavement. The pavement constructed under the patent was installed in a toll road and used publicly for a period of six years. The Supreme Court held it was an experimental use emphasizing the owner of the patent ac-

4. Title 35 U.S.C. § 102 provides: "A person shall be entitled to a patent unless * * * (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

tually controlled his invention; that he built the road at his own expense; and that his day-to-day conduct indicated he intended to apply for a patent when he was satisfied that no further improvements were necessary.

However, in support of the Court's findings, the record before us discloses that neither Camras nor Armour sought the aid of 3M in connection with oxides or their use on tapes. In April of 1946 there was no cooperative relationship between Armour and 3M. The latter was already interested in the magnetic tape business, and it made its contact with Armour in furtherance of its own commercial interest. Armour built a kiln to produce the oxides in larger quantities. While plaintiff scoffs at the meager ten pounds of oxide sent to 3M, the record discloses that such an amount was sufficient to coat ninety 1200-foot reels of $1/4$ inch tape.

■ The unrestricted deliveries and the use of the oxides by 3M having been shown as well as the shipment of the oxides to Du Pont Company on June 20, 1946, the burden fell upon plaintiffs to establish that any use made of such oxides was experimental. We hold there is sufficient credible evidence in the record to support the trial court's findings that the use made by 3M of the oxides was a public use, and the conclusions drawn by the trial court on that point were correct.

■ As early as December, 1941, George S. Mepham Corporation had produced synthetic oxides. They were not, at that time, used in making magnetic recording media. These oxides were numbered MTR–1 and MTR–12, and were subsequently re-designated 277 and 278, respectively. These oxides were tested in 1942 by Magnaflux Corporation, and found to be highly magnetic and suitable for their purpose. However, they were not then used because of the cost involved. Mepham retained the oxides and in 1947 forwarded these oxides with others to Brush Development Company for use in recording media.

Subsequent tests in 1955 disclosed that MTR–1 (277) had an $H_c$ of 330 oersteds at a field of 1000 oersteds, $B_{fm}/B_r$ ratio of less than 2 to 1, and a rapid rise from 300 to 400 oersteds. Oxide MTR–12 (278) had a coercive force, $H_c$, of 240 oersteds at a field of 1000 oersteds, a $B_{fm}/B_r$ of less than 3 to 1, and a rapid rise between 300 and 400 oersteds. The particle size of both materials was found to be less than 1 micron in maximum dimension and to be acicular in shape. The trial court found the activities of Mepham constituted public use as well as an offer of sale. There is support in the record for such findings.

Although the Court found only an offer of sale, we think such finding brings the case at bar within the decisions of this Court in Wende v. Horine, 225 F. 501, 505, and Magee v. Coca-Cola Company, 7 Cir., 232 F.2d 596, 600, in which it was held that the statute does not require a "sale" but only a "placing 'on sale'."

There is ample support in the record for the findings of the trial court as to the activities of Mepham, and we hold that the Mepham oxides were an anticipation of the tape oxide claims in the patent in suit.

The trial court discussed other bases for its decision of invalidity of the patent in suit, including the record member claims thereof. It would unduly prolong this already lengthy opinion to say more than that the findings of the trial court with respect thereto are supported by the evidence, and we can find no error in the conclusions drawn.

With its answer, Williams filed a first and a second counterclaim. The latter was later thrice amended. The first counterclaim included a prayer for a declaratory judgment which was, in effect, sustained by the Court holding the patent in suit to be invalid. It also incorporated the claim that Armour and 3M had obtained a sweeping monopoly as to magnetic recording tape and magnetic iron oxide, and alleged plaintiffs' conduct created an *"in terroreum"* in the trade. This latter charge was not pressed on this appeal.

The second counterclaim alleges a violation by Armour and 3M of the antitrust laws of the United States, particularly §§ 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1, 2. Later, an amended second counterclaim was filed.

It is alleged in the amended second counterclaim that 3M dominates the magnetic recording tape industry, being the largest producer of such tape in the world. It is also alleged the magnetic recording industry has grown from infancy at the time of World War II to one of the major industries in this country. The counterclaim describes Armour's policy of issuing restricted licenses after its agreement with 3M, and which it is claimed has resulted in a situation whereby 3M is now the only Armour licensee engaged in the business of manufacturing magnetic tape in the United States.

The amended second counterclaim alleges an agreement between Armour and 3M in 1947 whereby 3M would file a patent application with the idea that an interference would be declared in the patent office with the application for the patent in suit. In a memorandum by 3M it was stated: "If interference develops it could be handled on a perfectly friendly basis."

3M did file its patent application on February 16, 1948 in the names of Smith, Wetzel and Herr who swore they had invented both the black and gamma oxides of high coercive force and "record members" containing them. Two substitute applications, one for the black oxide, and one for the gamma oxide, were filed in 1950 with similar oaths. The trial court found Smith never believed that he had invented either oxide. The interference proceeding, which was in the nature of shadow boxing, was carried on for nearly two years before being terminated privately by 3M's concessions of priorities to Camras. It was at this time Armour agreed to restraints upon its future conduct of its licensing system.

We are handicapped in considering the second amended counterclaim by the brief manner in which the trial court referred to the issues raised thereby. The trial court's opinion, findings and conclusions in this case occupy forty-one pages of the printed appendix. All issues pertaining to the validity of the patent were considered in great detail and we have approved the trial court's findings and conclusions in reference thereto. By comparison, the reference to the counterclaim issues is contained in a few short paragraphs.

It is a practical impossibility for us to carefully examine the more than five thousand pages of the printed appendices to pick out testimony and evidence that might pertain to the issues raised by the counterclaims. We have considered the possibility of sending the case back to the trial court for additional findings on such issues. However, we finally have determined that there are sufficient findings and conclusions before us so that we can now pass upon such issues.

■ The trial court found that there has been no price-fixing or patent-pooling or cross-licensing; also there has been no use of a patent or patents to control the manufacture, use or sale of unpatented articles or materials, nor has there been any attempt to force others to buy only the patented products. The Court also found there has been no joint control of any licensing program between plaintiffs Armour and 3M.

There was considerable evidence which would have justified contrary findings, but again, we must accept such findings unless clearly erroneous, and there is in the record before us credible evidence to support the Court's findings on these issues. Certainly, we cannot say that such findings are clearly erroneous.

The same holds true of the Court's finding that the defendants did not prove the alleged misuse of the patent in suit. We hold the trial court was correct in concluding that misuse of the patent in

suit and violation of the anti-trust laws by plaintiffs were not sufficiently established by the proof.

■ A question has been raised as to the provision in the judgment referring to costs. Although we think defendants should have been awarded costs without any offsets, we defer to the trial court in that respect. However, we invite the trial court's attention to the provision in the judgment whereby Technical Tape's costs are to be offset by costs incurred by plaintiffs in defending the counterclaims. Inasmuch as Technical Tape did not interpose a counterclaim, its costs should not be offset.

Judgment affirmed.

On Petition for Rehearing.

PER CURIAM.

We have authorized the entry of an order denying the petition for rehearing filed by plaintiff Armour and also denying the petition for rehearing filed by defendant Williams.

We invite the attention of the District Court to the matter of costs in that Court. We stated in our opinion that defendants should have been awarded costs without offsets, but we would defer to the trial court in that respect.

■ On the petition for rehearing, Williams points out that paragraph 9 of the judgment seems to authorize an offsetting of plaintiffs' costs in defending the first counterclaim. This was for a declaratory judgment of invalidity and non-infringement. Although in form dismissed, the counterclaim was in effect sustained by the Court's holding of invalidity of the patent in suit.

If a differentiation can be made as to costs in defending the first and second counterclaims, it is clear there should be no offset as to the defense of the first counterclaim.