**KOEHRING COMPANY, Plaintiff-Appellee,**

v.

**NATIONAL AUTOMATIC TOOL COM-PANY, Inc., Defendant-Appellant.**

No. 15356.

United States Court of Appeals Seventh Circuit.

June 3, 1966.

Rehearing Denied June 29, 1966.

D. D. Allegretti, George P. McAndrews, Bair, Freeman & Molinare, Chicago, Ill., for appellant.

William A. Denny, Milwaukee, Wis., Jarrett Ross Clark, Chicago, Ill., for appellee.

Before SCHNACKENBERG, CASTLE, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

The defendant, National Automatic Tool Company, Inc., an Indiana corporation, appeals from a judgment of the district court in an action for patent infringement brought by the plaintiff, Koehring Company, a Wisconsin corporation, as the owner by assignment of United States Letters Patent No. 3,084,-512. The district court held Koehring's patent valid and infringed by National.

Both Koehring and National are engaged in the manufacture and sale of various types of heavy machinery, including plastics injection molding machines, Koehring through its HPM Division [1] in Mount Gilead, Ohio and National in Richmond, Indiana. Plastics injection molding machines are large industrial machines used in the manufacture of a variety of commercial plastics products. The patent in suit relates to a comparatively small internal component of these machines, an improved prefill and shift-over valve mechanism for use in that part of the machine which operates the clamp for opening and closing the mold into which molten plastic is poured.[2]

National admitted infringement in the district court, subject to a determination of validity, and conceded the validity of the patent in all respects other than its assertion that the patent was invalid because the invention it described was in public use and on sale more than one year prior to the application for a patent. Accordingly, the only question presented is whether the district court correctly determined that the invention was not in public use or on sale within the meaning of 35 U.S.C. § 102(b). Since we have concluded that the patent is invalid by reason of the public use of the invention prior to the critical date, our discussion of the facts will be limited to those bearing directly upon that issue.

United States Letters Patent No. 3,-084,512 was issued to Donald A. Huelskamp, an employee of HPM and the assignor of Koehring, on April 9, 1963, following an application filed on March 10, 1958. Thus the critical date for purposes of section 102(b) is March 10, 1957. The activities of the inventor Huelskamp and Koehring's HPM Division with respect to the invention prior to that date have been variously characterized as "experimentation" [by Koehring] and "commercial exploitation" [by National].

Huelskamp conceived the invention in suit in mid-1955 during the course of a redesigning program instituted at HPM after a new line of injection molding machines met with limited commercial success. Drawings of a prefill valve mechanism embodying the invention were completed in late 1955 and the mechanism was included in the design and prototype

---

1. The Hydraulic Press Manufacturing Company, an Ohio corporation, was merged into Koehring in 1956.

2. Further description of the invention disclosed by the patent is unnecessary inasmuch as the claims of the patent do not constitute the subject matter of this appeal.

of a machine known as the 450–H–20.[3] The 450–H–20 prototype was completely assembled by August 1956. During that month it was successfully "dry cycled," that is, operated without molds or plastic material. Huelskamp expressed satisfaction with the machine's operation and a plant order for its testing in HPM's "showroom-laboratory" was issued.

HPM's testing facility is being referred to as a "showroom-laboratory" because of the function it performed in HPM's sales programing. The vice president in charge of engineering at HPM conceded that it was a customary sales promotional practice to bring prospective customers into the laboratory to view HPM's line of machines. In his own words, "We have facilities there to demonstrate the actual performance of our machines, and it is used as a sales tool in that respect." Thus, after the 450–H–20 prototype embodying the Huelskamp invention was placed in the laboratory and as it was being tested, potential customers of HPM were present. No apparent restrictions as to secrecy were imposed upon the engineering or technical personnel of these customers during their visits. On September 5, 1956, representatives of the General Tire Company witnessed the testing of their plastic material, polyvinyl chloride, in the prototype. Several other potential customers visited the showroom-laboratory during the succeeding few months before the prototype was removed.

Huelskamp witnessed many tests of the prototype run with actual molds during the fall of 1956 and again expressed satisfaction with the performance of his invention.[4] On October 4, 1956, in an intracompany memorandum, the production manager of HPM informed a company vice president that the 450–H–20 had been determined "satisfactory as prototyped" at a planning meeting two weeks earlier. Thereafter, in the period from October to December 1956, "stock orders" were placed for at least seventeen injection molding machines of the various sizes included in HPM's redesigning program. Production on a stock order basis, the intraplant ordering and manufacture of large quantities of machines prior to the actual possession of customer orders, was commonly undertaken as a customer convenience by HPM in connection with its more or less standard machines. The designs for all of the stock-ordered machines embodied the Huelskamp invention.

During the last week of February 1957, three weeks prior to the critical date, the 450–H–20 prototype was shipped to the Universal Molding Company, Upper Sandusky, Ohio, pursuant to an agreement. The agreement was basically a title-retention instrument giving Universal Molding an option to purchase or return the machine at the expiration of a six-month period. HPM broadly reserved the right of access to the machine for purposes of inspecting, testing, repairing, and modifying it. Universal Molding, however, was given the right to make the ordinary repairs necessary to keep it in good operating condition. Additionally, the following provision appeared in the sales agreement:

[Universal Molding] agrees to allow any of [HPM's] customers to visit its plant and see the machine in operation provided, however, that such visit shall be first approved by the President of [Universal Molding].

---

3. The first number indicates the machine's clamping force in tons, the letter "H" indicates that the machine is operated horizontally, and the last number refers to the weight of plastic, in ounces, which can be molded in each cycle.

4. In an interference proceeding in the Patent Office, Patent Interference No. 90,623, which determined the question of priority of invention as between Huelskamp and certain employees of National in favor of Huelskamp, Huelskamp asserted that his invention had been reduced to practice by September 1956. The Patent Office did not so find, but instead, in response to a concession by National's employees, found that Huelskamp's invention had been reduced to practice at least by April 12, 1957.

The 450–H–20 had logged six hours of "production" time at Universal Molding by February 27, 1957, but the record is unclear as to the details of this operation.

The foregoing summary relating to the issue of the public use of the Huelskamp invention is based upon HPM's own documents and the sworn statements of its own employees. The district court referred to a portion of this evidence in its findings of fact,[5] but made no reference to the nonsecret and commercially-tinged nature of the testing of the 450–H–20 prototype. It concluded that the patented device was not in public use more than one year prior to the application for a patent within the meaning of 35 U.S.C. § 102(b). The findings of the district court which perhaps shed the most light on its decision on this issue read as follows:

> Plaintiff's invention was but a segment of the giant machine and was not readily discernible to everyone. * * The invention was buried within the machine. * * * The invented device was still an experimental device in the month of March, 1957. * * * It was only after the experimental operation and testing at Universal Molding Company that the device showed reliable commercial utility and that occurred after March 10, 1957.

The court's determination that the invention was not in public use prior to the critical date thus appears to have been based upon (1) the conclusion that the testing of the 450–H–20 prototype in HPM's laboratory and at Universal Mold-ing prior to March 10, 1957 was "experimental" in a legal sense, and (2) the fact of the invention's internal placement. We are of the opinion that the court erred as to the first conclusion, and that the internal placement of the invention was not relevant to a proper determination of public use.

■■ The policy consideration supporting the invalidation of a patent for an invention which was in public use or on sale more than one year prior to the application for a patent is to prevent an inventor from concealing his invention while at the same time exploiting it commercially, thereby extending the duration of his legal monopoly. Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516, 520 (2d Cir.), cert. denied, 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946). The disclosure of an invention in compliance with the conditions imposed by law is a duty placed upon an inventor which is designed for the benefit of the public. Consolidated Fruit-Jar Co. v. Wright, 94 U.S. 92, 96, 24 L.Ed. 68 (1877).

■ A reasonable period of experimentation wherein the inventor may perfect what he has conceived has long been acknowledged as an exception to the requirement of seasonable disclosure. But this exception must be recognized as such; it must be so limited as not to interfere with the effectuation of the policy underlying the general rule of early disclosure. An inventor may not be permitted to use a period of experimentation as a competitive tool. "[T]he use

5. The bulk of the court's findings as to the testing of the 450–H–20 prototype reads as follows:

> By August, 1956, the prototype of the 450–H–20 machine had been assembled and was being tested in the HPM laboratory. One such test made in August, 1956, involved the molding of parts from a plastic called polyvinyl chloride. The documentary records show that the prototype was operative although the polyvinyl chloride corroded the machine which then had to be partially dismantled for cleaning. Additional laboratory tests of the prototype of the 450– H–20 machine were made during the baland of 1956 and early 1957. In the week of February 28, 1957, the prototype was shipped to Universal Molding Company at Upper Sandusky, Ohio, for testing under actual field conditions in a commercial molding shop. It was there inspected, checked and modified periodically by HPM personnel. Not until April, 1957, was it considered by HPM to be operating in a commercially acceptable manner and the Court also finds that it was not operating in a commercially acceptable manner until April, 1957.

[of an invention] ceases to be experimental when the motivation of the inventor is to exploit the invention and gain a competitive advantage over others." Solo Cup Co. v. Paper Mach. Corp., 240 F. Supp. 126, 131 (E.D.Wis.1965).

■ In the present case we think that an operative embodiment of the Huelskamp invention was improperly used to commercial advantage under the guise of experimentation more than one year prior to the application for a patent and that consequently the patent is invalid under 35 U.S.C. § 102(b). The 450–H–20 prototype embodying the invention was fully assembled and operating to the satisfaction of both the inventor and the management of HPM several months before the critical date. Further testing of it, to be sure, was both desirable and contemplated. However, this testing was undertaken in an atmosphere of competitive activity. The machine was demonstrated to a potential customer of HPM and viewed by others in connection with sales promotions. No injunction of secrecy was imposed. Clearly this showroom-laboratory testing was a nonsecret use of the invention, and once a single use of an operative device embodying the invention prior to the critical date has been shown, the inventor must carry the burden of proving that the use was part of a bona fide program of experimentation. Atlas v. Eastern Air Lines, Inc., 311 F.2d 156, 160 (1st Cir. 1962), cert. denied, 373 U.S. 904, 83 S.Ct. 1290, 10 L.Ed.2d 199 (1963); Randolph v. Allis-Chalmers Mfg. Co., 264 F.2d 533, 536 (7th Cir. 1959). This burden is not sustainable on the record before us.

The shipment of the prototype to Universal Molding three weeks before the critical date for incorporation into the manufacturer's production line is further evidence of the abuse of the testing period. Koehring argues that since reliability and acceptable performance in a molding shop are essential characteristics of a successful plastics injection molding machine, the testing of the prototype by Universal Molding's regular production personnel was a necessary part of the perfection of its invention. Again, the desirability of such testing is not disputed. But an inventor or potential patentee may not enjoy the best of two possible worlds. "[H]e must content himself with either secrecy, or legal monopoly." Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., supra. The presence of the 450–H–20 machine at Universal Molding was not only without any significant injunction of secrecy, but HPM expressly reserved the right to present its customers at the plant to view the machine in operation. The record is inconclusive as to whether the prototype was actually used by Universal Molding for profit prior to the critical date, and Koehring argues that thus there was no public use. The argument is meaningless. The use which is here being condemned as an impermissible public use is the use of a machine embodying the invention in connection with a program of commercial exploitation, a program disconnected from and unnecessary to the legitimate perfection of the device by experimental means.

■■ Finally, Koehring argues, and the district court appears to have been persuaded by the argument, that the Huelskamp invention was not in public use because it is an internal part of a large machine and thus was not visible when the 450–H–20 prototype was assembled. But the fact that an invention is buried within a machine is irrelevant to a determination of public use. Hall v. Macneale, 107 U.S. 90, 97, 2 S.Ct. 73, 27 L.Ed. 367 (1883); Egbert v. Lippmann, 104 U.S. 333, 336, 26 L.Ed. 755 (1881); Watson v. Allen, 103 U.S.App.D.C. 5, 254 F.2d 342, 345 (1958). The use of an invention is a public use within the meaning of 35 U.S.C. § 102(b) when a machine embodying the invention is operated without any injunction of secrecy and is, in fact, exploited commercially.

The judgment of the district court is reversed.