The RED CROSS MANUFACTURING CORP., Plaintiff-Appellant,

v.

TORO SALES COMPANY, Defendant-Appellee.

No. 73–1900.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 23, 1974.

Decided Nov. 12, 1975.

Rehearing Denied Dec. 8, 1975.

Malcolm S. Bradway and Dennis M. McWilliams, Chicago, Ill., for plaintiff-appellant.

John W. Hofeldt, Chicago, Ill., for defendant-appellee.

Before FAIRCHILD, Chief Judge, and HASTIE * and CASTLE, Senior Circuit Judges.

FAIRCHILD, Chief Judge.

This is a suit charging infringement of plaintiff-appellant Red Cross Manufacturing Corporation's Lautzenheiser United States Patent No. 3,593,930, issued July 21, 1971, on an application filed September 11, 1970 in the name of the assignor-inventor Robert D. Lautzenheiser. The patent in suit is directed to a lawn and garden shredding machine (hereinafter vertical shaft shredder) in which two or more cutting blades are rotated within a shredding compartment by a vertical shaft gasoline engine. The blades are assisted in their cutting function by slotted breaker bars mounted on the inner side wall of the housing through which the ends of the rotating blades pass. Material to be shredded reaches the shredding compartment through a hopper, the bottom of which corresponds to an inlet opening in the top of the housing. An outlet opening in the side wall of the housing adjacent to the inlet provides an exit for the shredded material. After extensive pre-trial discovery, defendant-appellee Toro Sales Company moved for summary judgment "on the ground that there is no genuine issue as to any material fact and that the defendant is entitled as a matter of law to a judgment that U.S. Patent No. 3,593,930 is invalid under 35 U.S.C. § 102(b)[1] and is not infringed." In a memorandum order entered August 2, 1973, the district court granted summary judgment to defendant on the complaint, concluding that the patented invention was "in public use" and "on sale" more than one year prior to the date of the application for patent.[2] While defendant's answer interposed the defense of obviousness pursuant to 35 U.S.C. § 103, the district court did not consider the issue and determine the differences between the subject matter of the patent and the state of the prior art to which it pertains. Plaintiff appeals.

I

A study of the record discloses the following pertinent and undisputed facts. Red Cross had been operating as a Sears and Roebuck Co. manufacturing source for some 70 years prior to 1969. During those years, Red Cross manufactured and sold a variety of equipment to Sears which was then resold to the public through its catalogue and retail outlets. Sears operated during this period as Red Cross' "main source of sales" providing between 35% and 95% of Red Cross' business. Commencing sometime in the early 1960's, Red Cross had been manufacturing and selling to Sears a group of home garden and lawn shredding devices. These products included an "electric leaf mill," a small shredder powered by a vertical shaft electric motor, and a "compost mill," a shredder powered by a horizontal shaft gasoline motor and the subject of Lautzenheiser United States Patent No. 3,240,247.

Sometime during 1967 or 1968, as part of an on-going program at Red Cross of

---

* Senior Circuit Judge William Henry Hastie of the United States Court of Appeals for the Third Circuit is sitting by designation.

1. 35 U.S.C. § 102(b) provides in pertinent part: "A person shall be entitled to a patent unless—

   \*    \*    \*    \*    \*    \*

   (b) the invention was  .  .  .  in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States  .  .  .."

2. In the alternative, the district court denied summary judgment on the issue of infringement.

product development and improvement, and in response to some expressed dissatisfaction concerning the performance of the "compost mill" by Sears personnel, Robert D. Lautzenheiser, Red Cross design engineer, undertook a program of refining the existing product or developing a new device altogether. Among the expressed goals of the program were producing a machine with a simpler design configuration; increasing the volume of material which could properly be fed into the machine; achieving a finer grind; and producing a machine which could utilize a bagging system to collect the shredded product.

By November of 1968, Lautzenheiser had constructed an experimental prototype of a vertical shaft gasoline engine powered shredder. During that month, two Sears employees, James Bateman, a product engineer, and Larry Futch, a buyer, observed the machine at Lautzenheiser's home while visiting on other business and requested a demonstration. They were encouraged by the performance of the prototype and instructed Lautzenheiser to "pursue" development and further research in the product. The prototype which was demonstrated at this showing is no longer in existence and no drawings, plans, descriptions or test reports were preserved.

Additional work on the concept continued at Red Cross. A second vertical shaft shredder prototype was constructed and tested. This machine was preserved and photographs of it are available as exhibits in the present litigation. This prototype was apparently not displayed to Sears personnel. Testimony on the record concerning the structure indicates that it did not contain an inclined deflecting wall, later added to the patent, and that the configuration of the breaker bars also differed. Lautzenheiser testified that the second prototype required further development work in order to increase capacity, provide a finer grind, and a smoother operation.

Following the November, 1968 exhibition, Sears personnel periodically returned to Red Cross. One important object of these visits was to follow up on the development of the vertical shaft shredder. Testimony from both Red Cross and Sears personnel makes clear that Red Cross was developing the product under the assumption that, when completed to functional utility, Sears would purchase the new product on an exclusive basis. There was, however, no formal requirement or agreement to this extent; rather, the assumption followed from the prior relationship between the parties and the extensive sales to Sears by Red Cross of its product line.[3]

Two additional demonstrations of vertical shaft shredders to Sears personnel were conducted by Red Cross during 1969. In the late summer, a prototype was displayed to Sears at its Morton Arboretum testing site outside of Chicago.[4] The reaction of the Sears personnel present was favorable and Red Cross was given the "go ahead." The device demonstrated at this showing was retained by Sears and was not available for purposes of the present litigation. No drawings, test reports, or other documents concerning this prototype were produced. On September 8, 1969, a fourth vertical shaft shredder prototype was displayed to Sears personnel at the home of a Red Cross employee. During this showing, a private photographer retained by Red Cross was present for the purpose of making motion picture films of the prototype for use in presenting the new machine to Sears' field person-

---

3. There was no formal or written agreement between Red Cross and Sears concerning development or exclusive sales of the new vertical shaft shredder. All research and development costs were paid by Red Cross. Moreover, the record reveals that, by 1971, Red Cross was producing similar vertical shaft shredders for Montgomery Ward and under its own name.

4. Plaintiff correctly notes that there is no evidence concerning the exact date of this demonstration. It is uncontroverted, however, that it occurred more than one year prior to the date of the application for patent.

nel. Once again, neither the prototype nor any documentary description thereof survived, though a film was admitted into evidence which could well depict the September 9 display.

A vertical shaft shredder appeared in Sears' 1970 edition of its Suburban and Farm Living catalogue. Documentary evidence established that the catalogue was prepared during late summer and early fall of 1969.[5] The catalogue was printed and gathered on October 28 and 30, 1969 and made available to the retail outlets on November 8, 1969. On September 9, 1969, Red Cross President Ullman submitted to Sears an Estimated Cost of Tooling form necessary for Sears' purchase of tooling on a "compost blender" identified as the vertical shaft shredder. This estimate was accepted on October 3, 1969. On October 1, 1969, Red Cross received a contract dated September 16, 1969 authorizing purchase of 1150 vertical shaft shredders by Sears.

## II

The district court concluded that the invention described in the patent at issue was "on sale" as provided in 35 U.S.C. § 102(b) more than one year prior to the date of the application for the United States patent. The date of application was September 11, 1970 and the critical date for purposes of this consideration was therefore September 11, 1969. The parameters of the "on sale" bar to patent validity were set forth by this court in *Amphenol Corp. v. General Time Corp.,* 397 F.2d 431, 433 (7th Cir. 1968):

Patent applications must be filed within one year of placing the claimed subject matter "on sale." Title 35 U.S.C. § 102(b). "On sale" does not mean an actual accomplished sale but activity by the inventor or his company in at-

tempting to sell the patented idea. *Armour Research Foundation v. C. K. Williams & Co.,* 7 Cir., 1960, 280 F.2d 499, 506; *Magee v. Coca-Cola Co.,* 7 Cir., 1956, 232 F.2d 596, 600.

See also, *George R. Churchill Co. v. American Buff Co.,* 365 F.2d 129, 134 (7th Cir. 1966); *Wende v. Horine,* 225 F. 501, 505 (7th Cir. 1915).

■ The policy underlying the "on sale" bar is to prevent an inventor from holding back the secrets of his invention from general public knowledge while at the same time exploiting it commercially, thereby extending the duration of his legal monopoly. *Koehring Co. v. National Automatic Tool Co.,* 362 F.2d 100, 103 (7th Cir. 1966); *Metallizing Engineering Co. v. Kenyon Bearing & A. P. Co.,* 153 F.2d 516, 520 (2nd Cir. 1946); see generally, New Guidelines for Applying the On Sale Bar to Patentability, 24 Stan.L. Rev. 730, 733–34 (1972). Under the statute, an existing patent is presumed to be valid. 35 U.S.C. § 282. When the objection is asserted, the burden of establishing that the patented product was "on sale" before the critical date is on the objector. *Dart Industries, Inc. v. E. I. Du Pont De Nemours and Co.,* 489 F.2d 1359, 1364 (7th Cir. 1973), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236. This burden must be satisfied by clear and convincing evidence. *Minnesota Mining & Mfg. Co. v. Kent Industries, Inc.,* 409 F.2d 99, 100 (6th Cir. 1969). Once such activity has been successfully established, invalidity may be avoided by showing that the sales activity was "substantially for purposes of experiment." *Smith and Griggs Mfg. Co. v. Sprague,* 123 U.S. 249, 256, 8 S.Ct. 122, 31 L.Ed. 141 (1887). The burden of proving experimental purpose rests with the inventor and must be met with "full, unequiv-

---

5. Internal records of Sears reveal that the copy contained on the temporary page which became the page displaying the vertical shaft shredder was released to the printer on August 22, 1969. The art work displayed on the page was prepared during the period from July 14, 1969 to September 10, 1969 when the finished art was approved for the engraver or printer. No evidence appears on the record of any changes made in the copy of art work prior to submission to the printer. These business records were interpreted by a Sears employee who had custody over them and indicated familiarity with their form.

ocal, and convincing" evidence. *Id.* at 264, 8 S.Ct. 122.

In this case the undisputed facts disclose that Red Cross engaged in sufficient sales activity prior to the critical date so as to be properly characterized as placing some sort of a vertical shaft shredding device "on sale." The district court, relying principally on the events of September 8 and 9, 1969, so decided. Our examination of the record persuades us that there is no issue of fact as to sales activity at that date. While Red Cross, as a matter of general characterization, sought to describe the relations with Sears during the period prior to the critical date in connection with the vertical shaft shredder prototypes as not a part of any sales activity, such conclusory allegations are insufficient, in the face of uncontroverted facts revealing sales activity contained in the record, to preserve any material issue of fact.[6]

■ As our discussion in *Amphenol Corporation* set forth above makes clear, the statutory proscription of § 102(b), is concerned not with the formal requisites of the challenged activity, but with its effects. Thus, actions which are found commercially to exploit an invention prior to the critical date require a finding of an "on sale" bar. The record establishes that, from its inception in 1967 or 1968, Red Cross intended to sell the new vertical shaft shredder to Sears, its longstanding major customer. President Ullman admitted that as early as the late summer Morton Arboretum showing, the

purpose was hopefully to sell the prototype or a substantially similar device to Sears. This admission is uncontradicted by the facts of record.[7] On July 8, 1969, Ullman wrote to Sears' buyer Futch that "I am in the process of getting lined up on engines for the new compost mill and am still not sure when you want to start production on this item, and what your objectives are on the original run."[8] At the September 8 demonstration, motion pictures of the prototype were taken for the purpose of familiarizing Sears' field representatives with the new product. On the following day, Red Cross ordered 50 vertical shaft gasoline engines from its supplier and prepared a tool cost estimate sheet, submission of which was a prerequisite for Sears' purchase of the production tooling of a new product. This document also contained estimated sales projections of the product. The vertical shaft shredder appeared in Sears' 1970 Suburban and Farm Living catalogue which was prepared during late summer of 1969 and issued to Sears' retail outlets on November 8, 1969. The existing Red Cross horizontal shaft compost mill was not included within this catalogue. In his July 8 letter to Futch, Ullman sought to persuade the buyer to retain the existing compost mill in the catalogue in order to recover extensive retooling costs. A sales contract committing Sears to purchase 1150 vertical shaft shredders was completed on September 16, 1969, only eight days after the demonstration. No evidence is on the record of any sales activity by Red

6. Ullman, in his deposition testimony and affidavit, characterized the purpose of the various showings to Sears as "developmental" or "experimental" with any sales activity only incidental thereto. This evidence goes to whether Red Cross can establish an experimental use exception to any "on sale" bar and is discussed *infra.* See part IV.

7. Red Cross argues that the apparent complete lack of inventory and tooling prior to the critical date precludes as a matter of law a finding of "on sale." There is no merit to this proposition. The "on hand" requirements of *McCreery Engineering Co. v. Massachusetts Fan Co.,* 195 F. 498, 501 (1st Cir. 1912) and similar cases have not been followed in this

circuit. See *Dart Industries v. E. I. Du Pont De Nemours and Co.,* 489 F.2d at 1365. Moreover, as noted *infra,* commercial exploitation of a single device which is reflected in the claims of the patent and essentially completed is sufficient to trigger the "on sale" bar unless an experimental use can be shown. *Id. cf. Egbert v. Lippmann,* 104 U.S. 333, 26 L.Ed. 755 (1881).

8. Ullman testified that the term "compost mill" was applied interchangeably between the horizontal and vertical shaft shredders during this period and that the "new" product referred to in the letter was the vertical shaft shredder.

Cross between September 11 and the 16th. There was clearly no issue but that the vertical shaft shredder in its then stage of development was on sale.[9]

■ Arrival at this conclusion does not, however, foreclose our consideration of the propriety of the district court's entry of summary judgment against Red Cross on the basis of the "on sale" bar of § 102(b). The language of the statute requires that "*the invention* was . . on sale . . . more than one year prior to the date of the application for patent in the United States." [Emphasis added.] Accordingly, in cases in which commercial exploitation has been established prior to the critical date, a necessary determination must be whether the item placed "on sale" sufficiently embodied the invention described in the patent in suit to invoke the bar of § 102(b). In examining this question, "a typical issue is whether the product sold is sufficiently similar to the product described in the claims to invoke the statutory bar. See e. g., *Frantz Mfg. Co. v. Phenix Mfg. Co.,* 457 F.2d 314, 318–23 (7th Cir. 1972). Exact identity is not required as long as the invention is essentially completed at the time of the invalidating sale." *Dart Industries, Inc. v. E. I. Du Pont De Nemours and Co., supra,* 489 F.2d at 1365.

On the record before us, there is no question but that the vertical shaft shredders placed "on sale" by Red Cross more than one year prior to the date of patent application were operable for their intended function. Robert Lautzenheiser, the inventor and patentee testified that the 3½ horse power vertical shaft shredder prototype displayed to Sears personnel at the late summer Morton Arboretum showing functioned satisfactorily—"more or less" as well as the present model. President Ullman of Red Cross testified that a purpose of the showing was to sell a "substantially similar" device to the one demonstrated to Sears. They were seeking to establish that Red Cross had a machine substantially ready for production. There is no indication in his affidavit concerning the September 9 prototype that it did not function adequately.[10] Indeed, Sears' evaluation engineer later wrote, in evaluating that prototype: "The performance was considered excellent. They presented costs which were less than we were paying for the horizontal compost mill. My conclusion was that the design would outperform machines costing two or three times the proposed price of this machine." The problem, however, is that the record does not establish the identity of the device in existence September 8 and 9, 1969 with the invention later claimed, and thus does not show that there is no genuine issue as to that material fact.

■ In reaching his decision on this question, the district court relied upon the prototype displayed by Red Cross to Sears on September 9, 1969 and presumably depicted in a 16 mm. motion picture introduced into evidence by defendant.[11]

9. Red Cross argues that, as a matter of law, the "on sale" bar cannot be applied to any sales activity between Red Cross and Sears prior to the critical date due to the "exclusive" sales arrangement allegedly contemplated by the parties. There is no merit to this argument. Assuming the existence of such a contemplated arrangement, see note 3 and accompanying text, *supra,* we note that the scope of the § 102(b) "on sale" bar is not limited to commercial activity directed towards the general public or to competing purchasers as Red Cross suggests. Once it is shown that the patentee has placed an essentially completed embodiment of his invention "on sale" more than one year prior to his application for patent, the § 102(b) bar is applicable, regardless of the contemplated nature of the ultimate sales transaction.

10. In this connection, we note that on the following day, Red Cross submitted a tool cost estimate sheet for a vertical shaft shredder to Sears.

11. The district court did observe that "the inventor himself testified that a prototype demonstrated as early as 1968 was practically identical with fig. 2 in the patent application with the exception of the size and that it functioned 'very well.'" When the testimony relied upon is taken in context with the preceding questions, its meaning is ambiguous, and cannot be relied upon in resolving the issue.

In opposition to the motion for summary judgment, Red Cross President Ullman submitted an affidavit detailing certain design features reflected in the patent which did not appear in the prototype depicted in the film. The district court predicated his discussion of the question upon this affidavit, concluding that there is no genuine issue of fact but that the prototype shown on September 8 and 9, 1969 embodied the invention covered by the patent in suit. We disagree. Assuming that the court's conclusion that the film depicted a prototype offered "on sale" prior to September 11, 1969 was correct,[12] we find that material issues of fact remain.

■ In order for the "on sale" bar to apply, the patent claims at issue must describe the invention offered for sale. Cf. Tri-Wall Containers, Inc. v. United States, 408 F.2d 748, 751, 187 Ct.Cl. 326 (1969), cert. denied, 396 U.S. 828, 90 S.Ct. 78, 24 L.Ed.2d 79. In Ullman's affidavit, it is asserted that "[a]fter this prototype or prototypes [depicted in the film], design changes were made in this general class of shredder including a change in the hopper mounting from a hinged mounting to a bolt-on type of mounting, the development of a hinged hopper lid, relocation of the supporting wheels of the shredder, changes of the breaker bar design within the shredder, and changes in the inlet area of the shredder. These changes were incorporated into commercial shredders for which production started around the first of November, 1969." There is no evidence on record showing an interpretation and explanation of the patent claims; nor are there any plans, drawings, specifications or contemporaneous descriptions of the prototype. All

that is available is Ullman's affidavit. Considering this affidavit most favorably to Red Cross, see United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Poller v. Columbia Broadcasting System, 368 U.S. 464, 472–73, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), and resolving all doubts as to the existence of a material fact against defendant, Moutoux v. Gulling Auto Electric, 295 F.2d 573, 576 (7th Cir. 1961), the question remains whether whatever invention there may be in the machine depicted in the film is described by the patent claims which set forth in some detail the function and configuration of the hopper lid, inlet opening and breaker bars.[13]

Defendant correctly notes that, in light of Sears' decision to replace the existing "compost mill" in its catalogue with a vertical shaft shredder during the summer of 1969, its completion of a contract authorizing purchase of 1150 machines as early as September 16, 1969, and the conceded functional operability of the prototypes, it is highly improbable that any of the asserted design changes made after September 9, 1969 were significant in terms of the claimed invention. Indeed, were we presented with the present record after trial, we would find little difficulty in affirming such a finding. We are confronted, however, with a grant of summary judgment which should not be used to resolve disputed factual issues, even though the court may feel that the result is very probably the same as will ultimately be reached after trial.

■ Defendant argues that the affidavit establishes that changes were made only to claimed elements already

---

12. Ullman in his deposition concerning the film, admitted that "[i]t is my belief that this film may be the film which was taken by the aforesaid, Larry T. Walker, on September 9, 1969." [Emphasis added.] There is no direct evidence on the record, however, concerning the date of filming though the content of the motion picture does correspond closely to descriptions of the film taken on September 9, 1969.

13. We have examined the testimony concerning the asserted differences in structure between the prototype offered to Sears personnel at the late summer Morton Arboretum showing and find the same material issues of fact to be present.

existing in the prototype and that it therefore necessarily follows that the device was described in the patent claims. We disagree. The evidence on the record does not establish the full nature or extent of the asserted changes. Certainly, major modifications in important elements of an invention could be significant enough to prevent a finding of functional embodiment of the patent's claims.

To summarize, the defense of obviousness, though raised by defendant, is not before us. Assuming, for the purpose of this decision, that there was an invention which would survive a § 103 challenge, the present record does not conclusively establish that such invention was embodied in the device demonstrated September 8, 1969. It does not show either that there were no changes after that date, or that any changes made thereafter were refinements and insignificant.

Thus summary judgment should not have been granted based on § 102. This follows even though a trial record containing the same evidentiary facts would clearly be adequate support for a finding by the trier of fact that there were no significant changes after September 8, 1969, and that the invention, if any, was on sale and in public use on that date.

Accordingly, the judgment must be reversed.

### III

■ The district court also found that all three demonstrations of prototype vertical shaft shredders to Sears, described above in part I, constituted "public use[s]" in contravention of 35 U.S.C. § 102(b). Under this proscription,

invalidity may be established either by showing a non-secret use of the invention prior to the critical date, see e. g., Smith and Griggs Mfg. Co. v. Sprague, supra; Electric Battery Co. v. Shimadzu, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071 (1939), or by establishing that the inventor has commercially exploited the invention prior to the critical date without an injunction to secrecy, Koehring Co. v. National Automatic Tool Co., supra. In the present case, the district court predicated "public use" invalidity on both grounds, finding the demonstrations to be non-secret in character and relying upon the sales activity discussed above.[14]

■ Our discussion concerning the propriety of summary judgment on the "on sale" issue necessarily requires reversal on the "public use" finding as well. The statute requires that "the invention was . . . in public use" more than one year prior to the critical date. On either of the alternative bases relied upon to find a "public use," the controverted and unresolved issue of the functional identity of the prototypes displayed prior to September 11, 1969 with the patent claims at issue requires reversal and remand for further proceedings.[15]

### IV

■ Red Cross has argued, both before the district court and on appeal here, that summary judgment was inappropriate on account of the presence of unresolved issues of fact concerning whether any "public use" or commercial activity was intended to be for the purpose of experimentation. It is well established that "a reasonable period of

---

**14.** Thus, under the circumstances of the present case, facts sufficient to establish an "on sale" bar will also show a "public use." Compare Dart Industries, Inc. v. E. I. DuPont De Nemours and Co., supra, 489 F.2d at 1364 n. 8 and accompanying text.

**15.** Red Cross argues that there was no "public use" as a matter of law because there is no evidence on the record that any member of the public other than "authorized" Sears and Red

Cross personnel were present at the showings. There is no merit to this argument. We have previously discussed the commercial exploitation present in the late summer and September 8 demonstrations. The record is bare of any suggestion of "injunctions of secrecy," Koehring Co. v. National Automatic Tool Co., supra, 362 F.2d at 104, to the Sears personnel present.

**1144**

experimentation wherein the inventor may perfect what he has conceived has long been acknowledged as an exception to the requirement of seasonable disclosure." *Koehring Co. v. National Automatic Tool Co., supra,* 362 F.2d at 103. Accordingly, "the use of an invention by the inventor himself or any other person under his direction, by way of experiment, and in order to bring the invention to perfection" has not been regarded as a "public use" within the meaning of the statute, even though the invention or experiment proves complete and requires no modification or change. *City of Elizabeth v. American Nicholson Pavement Co.,* 97 U.S. 126, 134, 24 L.Ed. 1000 (1877); *Cali v. Eastern Air Lines, Inc.,* 442 F.2d 65 (2nd Cir. 1971). Similarly, although the experimental use doctrine developed, and has most frequently been discussed in cases applying the "public use" bar, it is clear that at least in some situations, the placing of an invention "on sale" for experimental purposes to enable the inventor to determine whether the invention is complete and functional does not place the invention "on sale" within the meaning of the statute. See *Dart Industries, Inc. v. E. I. Du Pont De Nemours and Co., supra,* 489 F.2d at 1366.

The question of whether a use of sales activity is for the purpose of experimentation is one of the inventor's intent. "[T]he use ceases to be experimental when the motivation of the inventor is to exploit the invention and gain a competitive advantage over others." *Solo Cup Co. v. Paper Machinery Corp.,* 240 F.Supp. 126, 131 (E.D.Wis.1965), *modified on other grounds,* 359 F.2d 754 (7th Cir. 1966). Red Cross argues that material issues of fact remain concerning its purpose in displaying the prototypes to Sears at the late summer Morton Arboretum showing and at the September 9 demonstration which was recorded on film. See note 6, *supra.*

We conclude that in the light of the circumstances of the development of the device, disclosed by the present record, Mr. Ullman's testimony characterizing the showings to Sears as developmental or experimental could not, standing alone, constitute full, unequivocal, and convincing evidence that they were substantially for purposes of experiment. Red Cross, however, is not foreclosed from introducing further evidence at trial in an effort to meet its burden on this issue.

The Clerk of this court is directed to enter judgment reversing the judgment appealed from and the cause is remanded for further proceedings consistent with this decision. No costs of appeal are awarded to any party at this time. They may be taxed by the district court and included in its judgment in favor of the party who ultimately prevails.