UNITED STATES GYPSUM COMPANY,
Plaintiff-Appellee,

v.

NATIONAL GYPSUM COMPANY and
Plaza Plastering Co., Defendants-
Appellants.

No. 17613.

United States Court of Appeals,
Seventh Circuit.

March 11, 1971.

Rehearing Denied April 15, 1971.

Certiorari Denied June 14, 1971.
See 91 S.Ct. 2233.

Charles J. Merriam, Allen H. Gerstein, Chicago, Ill., for defendants-appellants; Merriam, Marshall, Shaprio & Klose, Chicago, Ill., of counsel.

Albert H. Pendleton, Chicago, Ill., Arthur B. Seibold, Jr., Gregory B. Beggs, Chicago, Ill., for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, FAIRCHILD and KERNER, Circuit Judges.

FAIRCHILD, Circuit Judge.

This appeal is a sequel to United States Gypsum Company v. National Gypsum Company (7th Cir., 1967), 387 F.2d 799. Many of the pertinent facts appear in that opinion. The action is for infringement of a patent issued to Joseph W. Gill, "Method of Covering the Joint Between Wallboard and the Resultant Product."[1] We remanded the cause for further proceedings.

On remand, the district court made findings of fact on the basis of which it decided the subject matter would not have been obvious and the invention had not been in public use more than one year before the application. Appellants National and Plaza challenge these decisions and raise a third issue.

*A. Obviousness.*

1. *Scope and content of the prior art:* Where two sheets of wallboard join, the industry has for a long time used cement and strips or tapes of bridging material such as cloth, metal, or paper.

Green '667[2] claimed, in part, "a strip of thin metallic foil having perforations extending along" a wallboard joint. In the specifications, it was said: "To assist any moisture in the cementitious adhesive to escape and thus expedite

---

1. No. 2,749,267, issued June 5, 1956, the original application having been filed March 30, 1950.

2. No. 1,703,667, "Wall-Board-Joint System," issued February 26, 1929 to Ernest Green, assignor to U.S.G.

drying, and to facilitate mechanical bond between the thin metal foil and the wallboard, I prefer to perforate the foil in a casual way. The perforations * * * may take the form of holes of any shape so spaced that they leave sufficient tensile strength across the reinforced joint." A sketch indicates that the intended perforations were not minute, but readily visible holes. Metal tape was used for a time.

Page '982 [3] claimed in part "A paper tape suitable for adhesive attachment to wallboard joints, comprising a strip of paper having a substantial proportion of crossed fibers extending transversely of said strip. * * * " The specifications indicated Page's interest in "a high transverse tensile strength, a low stretch, a high breaking load, and a high modulus of elasticity * * * low transverse and longitudinal expansion on wetting." So-called "plain" tape has been used. Page '433 [4] claimed "Method of and Apparatus for Manufacturing Wallboard Joint Tape" with some of the characteristics referred to in Page '982.

Speer '532 [5] claimed in part "A tape * * * composed of overlying, adhering strips of perforated paper and wide mesh cloth. * * * " Speer said that the perforations in the paper "are preferably larger than the mesh openings of the cloth strip so that certain of the strands of the cloth strip span or intersect the paper perforations and function as keys or interconnecting webs in securing the tape to the joint. * * * These perforations permit the escape of air from between the tape and the wallboard and eliminate the formation of air pockets." A sketch shows that the perforations are not minute, but are readily visible. In practice, perfora-

tions in paper tape were produced by a punch and had diameters of ⅛ inch.

Camp '509 [6] described in the specifications a tape through the perforations in which the adhesive is forced on application.

Crandell '785 [7] claimed in part "a tape of finely woven fabric placed over said [wallboard] joint, said tape being attached to the edges of adjacent panels by means of an elastic glue substantially impermeable to air and moisture, said glue permeating said tape throughout. * * * " One of the stated advantages was the elimination of "breathing * * since the glue is substantially impermeable to air and moisture."

None of the prior art patents which directly relate to cementing and taping wallboard joints suggested the use of tape with perforations of a size which would permit the escape of air but prevent the escape of adhesive, none suggested perforation by electric spark, and none specified dimensions of perforations in tape within the range stated in Gill.

For a brief time before 1938, National produced a balloon cloth tape which was applied to joints in the manner set forth in Crandell '785. It did not achieve wide usage. Tape which was said to be a left over sample of National's balloon cloth tape was before the court. When not yet permeated with glue, the tape was highly porous. The average size of the interstices between the strands was smaller than the size of the smallest perforations specified in Gill, although the sizes of the largest interstices were within the range indicated in Gill. Appellants suggest that these interstices were perforations of such size as to permit the escape of air but prevent the escape of adhesive. The character of

3. No. 2,047,982, "Wallboard Joint", issued July 21, 1936 to John Page, assignor to U.S.G.

4. No. 2,180,433, issued Nov. 21, 1939.

5. No. 2,314,523, "Wallboard Joint Structure", issued Mar. 23, 1943 to Alexander D. Speer.

6. No. 2,537,609, "Process for Making Wallboard", issued Jan. 9, 1951 to Thomas P. Camp, assignor to U.S.G.

7. No. 2,064,785, "Sealed Joint", issued Dec. 15, 1936 to Dean D. Crandell, assignor to National.

the tape and the mode of its application, however, were so different from paper tape that neither the patent nor the balloon cloth tape may fairly be said to suggest the Gill idea. Moreover, the district court found that in practice, National's balloon cloth tape had been subject to blisters, formed over air pockets behind it.

One patent relating to the structure of wallboard disclosed possible spark perforation of a thin metal layer covering the wallboard. The invention concerned structure of wallboard and not formation of joints between pieces of wallboard. Roos '345 [8] claimed in part "gypsum-core building boards * * * said rear surfaces of the boards being substantially completely covered with perforated metal foil." The indicated purpose of the foil was to prevent excessively rapid escape of moisture from the boards and to enhance the heat resistance qualities of the completed wall. Roos preferred "perforations so minute that they are barely visible to the naked eye. * * * The perforations may be formed * * * by the use of small electric arcs which will serve to puncture the foil with suitably sized and spaced holes."

Several other patents disclose the idea of perforating paper and other materials by the use of electric arcs. None of these patents suggest application to wallboard or wallboard joints. Meaker '546 [9] claimed in part "A paper bag * * * formed with a large number of electric arc pierced, burrless perforations minute enough to prevent any substantial amount of pulverulent material from sifting out of the bag therethrough but sufficient in number and spaced closely enough together * * to substantially increase the air perviousness of the bag, whereby, through escape of air through said perforations the filling of the bag is facilitated. * * * " Meaker stated that "The size of the perforations may vary, for example, from about 1/200 to 1/1000 of an inch in average diameter. The number may vary from ten to one hundred per square inch, more or less. The pattern or spacing of the openings will ordinarily be quite irregular. However, the invention is not limited to these particulars, which are merely preferential and illustrative. The holes though small are cleancut, without burrs and tests indicate that they do not materially lessen the strength of the paper. * * * "

There are several later patents disclosing methods and apparatus for perforating paper or other sheet material: Meaker '508; [10] Wilsey '246; [11] Meaker '069; [12] and Meaker '366.[13]

2. *Differences between the prior art and the Gill claims:* Prior art in the particular field of forming wallboard joints included the use of unperforated paper tape and paper tape with perforations created by punches and having a diameter of $\frac{1}{16}$th inch. Meaker '508, and other patents, disclosed the idea of perforating paper by electric spark, producing holes with a range of diameters from .001 to .005 inch, and the idea that paper so perforated would retain certain fine powder substances while permitting air to escape through the holes.

Gill sets forth a range of diameters from .002 to .020 inch. Other than that, the difference between the prior art

8. No. 1,914,345, "Wall Construction", issued June 13, 1933 to Carlisle K. Roos, assignor to U.S.G.

9. No. 2,340,546, "Container", issued Feb. 1, 1944 to John W. Meaker.

10. No. 2,372,508, "Electrical Perforation of Paper and Other Fabrics", issued Mar. 27, 1945 to John W. Meaker.

11. No. 2,385,246, "Method and Apparatus for Perforating Sheet Material," issued Sept. 18, 1945 to Irven H. Wilsey et al.

12. No. 2,388,069, "Electroperforation of Sheet Material", issued Oct. 30, 1945 to John W. Meaker et al.

13. No. 2,550,366, "Method and Apparatus for Electroplating Sheet Material", issued April 24, 1951 on application filed Oct. 25, 1946 to John W. Meaker et al.

and the Gill claims (although claim 5 is the only one which specifies spark produced perforations) is essentially that Gill adapted an idea similar to that of Meaker to known elements in the art of forming wallboard joints.

The district court made a number of findings as to the usefulness of the result accomplished. Appellants challenged them, and claim that spark perforation is only a "gimmick". There is conflict in the relevant evidence, however. The findings are supported by evidence and we do not consider them clearly erroneous. The court found that cloth tape was unsatisfactory for a number of reasons and that National's balloon cloth tape was subject to blisters, formed over air pockets behind it. Unperforated paper tape results in blisters. Metal and paper tapes with substantial holes punched in them produced other disadvantages by reason of the extrusion of cement through the perforations. The court found that the use of tape conforming to Gill eliminated the need to buff nodules from the outer surface of the tape, resulting from cement escaping through punch perforations; substantially eliminated entrapment of air beneath the tape; avoided the pattern of punch perforation showing through the finished product; did not permit cement to pass through the tape while in the taping machine; and avoided creating the burrs and tabs which often remain attached to punch perforated paper tape.

3. *The level of ordinary skill in the pertinent art:* The district court found that wallboard joint tape applicators were persons of ordinary skill in the art, although it added that the subject matter was not obvious to National's "skilled research personnel who worked on the problems connected with the use of wallboard joint tapes, to National's other employees who produced and sold the tapes, or to National's field personnel who observed the use of wallboard joint tapes in the field." We have some doubt whether, in an industry where manufacturers of supplies have employees who devote considerable effort to seeking improvements in the products, the level of ordinary skill in the day to day ultimate use of such supplies is the appropriate level for the purposes of 35 U.S.C. § 103. The findings suggest that the district court had similar doubt and considered a higher level of skill which reflected experience as employees of manufacturers in attempting to improve the product and solve the customers' problems.

4. *Secondary considerations:* Spark perforated tape has enjoyed outstanding commercial success. U.S.G. put Gill tape on the market in 1950, at about the time the patent was first applied for. At first National's people concluded that the Gill tape offered no advantage. Applicators used it, however, to such an extent that by 1952, National decided to make spark perforated in lieu of plain tape although the cost of producing the former might be 18 per cent greater. The combined production of spark perforated tape by U.S.G. and National in the seven years preceding trial was over eight billion feet.

A somewhat countervailing consideration is the fact that one other person worked on the same idea at about the same time. Mr. Mackey, apparently a small tape manufacturer in California, experimented with spark perforation of tape during about the same years in the late '40s when Gill was developing his idea. Mackey apparently knew of the Meaker spark perforated paper and applied the technique to wallboard tape. Additional facts concerning Mr. Mackey's efforts will appear in the discussion of public use.

5. *Presumption of validity:* All wallboard prior art patents mentioned in this opinion were cited as references except Crandell '785. The manager of National's patent department, who had the Crandell patent in his file, conceded that its relevance did not occur to him until some years after the issuance of the Gill patent and National's search for prior art. We agree with the dis-

trict court that Crandell is less pertinent than those which were cited.

When the Gill application was first made, claiming tape and spark perforating apparatus, the examiner cited Meaker '546, Meaker '069, Meaker '508 and Roos '345. After the continuation application upon which the patent was issued, the examiner cited Meaker '546 and Roos '345. Of the patents concerning spark perforation mentioned in this opinion only Meaker '366 and Wilsey '246 were never cited. We agree with the district court that the latter two are less pertinent than those cited and that the two which were cited at both stages were the most pertinent.

In these circumstances Meaker '069 and '508 are deemed to have been considered, though not cited on the application on which the patent was issued.[14] And the omission of the less pertinent Crandell '785, Meaker '366, and Wilsey '246 does not weaken the statutory presumption.[15] We see nothing in any of the omitted patents which would tend to create a closer question of obviousness than do the patents cited.

6. *Obviousness: Would it have been obvious at the time of invention to adapt the Meaker ideas to the use of tape and cement in forming wallboard joints?* Punch perforations in paper tape were of a size which readily let air escape from under the tape but permitted extrusion of cement. Reduction in size of the punch perforations proved impracticable. Plain paper tape prevented extrusion of cement, but also trapped air. Appellants do not concede that this was a problem, nor that it was solved by Gill, but, assuming the affirmative, appear to argue as follows:

A hypothetical § 103 person (of ordinary skill in the art), desiring a tape which would not trap air but would retain cement, would find it obvious that perforations of some minute

dimensions would let air, but not cement, pass. Since the hypothetical § 103 person is assumed to know everything in the public domain, he is assumed to know that Meaker's spark perforation technique would produce, in paper, holes of a size such that air would escape and certain powder would be retained, and the hypothetical § 103 person would find it obvious to experiment with spark perforation of tape to see whether he could produce perforated paper which would retain wet cement, but avoid entrapment of air.

The determination by judges of what would or would not have been obvious to a hypothetical § 103 person is often a fanciful enterprise, as we confess it is here.

■ In reaching the conclusion of nonobviousness, we bear in mind the following:

a. As found by the district court, "No one skilled in the art testified that the subject matter of the Gill invention was obvious at the time the invention was made."

b. The patent office examiner decided that it would not have been obvious. His decision is presumptively correct.[16]

c. The district judge concluded the subject matter would not have been obvious. Although his conclusion is not controlling on appeal, his advantage of close attention to the case while it was being presented entitles his conclusion to weight.

d. The commercial success, though a secondary consideration, seems relevant and persuasive here.

e. Our own subjective impression is that the subject matter would not have been obvious, particularly since the *Meaker* idea appears not to have previously been used or identified with

---

14. Otto v. Koppers Company (4h Cir., 1957), 246 F.2d 789, 801.

15. TSC Industries, Inc. v. International Harvester Company (7th Cir., 1968), 406

F.2d 53, 55; Otto v. Koppers Company, *supra*, fn. 14.

16. 35 U.S.C. § 282.

the particular field of endeavor involved in this case.

Spark perforation makes possible the forming of minute holes of dimensions which accomplish the desired result, not feasible by use of previously used methods of perforation. Although appellants contend that the invention is "the mere changing of * * * size [17] we do not consider it simply that, under these circumstances.

### B. *Prior public use.*

Appellants contend that the invention was in public use or on sale before March 30, 1949, one year before Gill's filing date.[18] They rely on the activity of the W. L. Mackey Company. The district court found that "There was no evidence whatsoever that any spark perforated tape produced by the W. L. Mackey Company was used in forming wallboard joints prior to the critical date of March 30, 1949."

As already noted, Mr. Mackey experimented with spark perforated tape. He testified that he began his experiments in 1946 or 1947. Others corroborated him at least to the extent of his having done so before January, 1949. There was no evidence as to the measurement of perforations in any Mackay tape.

The earliest recorded sale by Mackey of spark perforated tape, so designated, occurred in January, 1950. He testified that he had sold some as early as 1948, but under the designation "beveled", the same as his plain tape. He gave no persuasive explanation for not giving it a distinct label. We conclude his testimony concerning these sales does not fulfill the standard of clear and convincing proof required to establish that an invention was in public use or on sale under sec. 102(b).[19]

In August, 1948, Mr. and Mrs. Mackey made a trip east by automobile and carried along "samples of spark tape which we called beveled tape." They left a sample with a Mr. Thomas at the plant of a customer in Louisiana and gave another to a Mr. Pine at the customer's plant in Illinois. Mackey said he wanted to get Pine's reaction to the tape. Pine testified that he made some tests. "When we examined it, we weren't too impressed with it, and I can only say that we probably gave it a good examination because Mr. Mackey was well liked by the principals of my company, and I was not anxious to put him in a doghouse, so to speak." After the tests, the balance of the tape was thrown away. Pine's answer to two questions put by counsel and containing the word "sell" are, in their context, less than clear and convincing proof that Mackey was offering the spark perforated tape for sale at that time.

■ We conclude that there was, as found by the district court, no evidence that the combination and method claimed by Gill were in public use before March 30, 1949. Moreover, there was not sufficient evidence that the tape alone was on sale before that date.

### C. *Non-infringing use of tape.*

Appellants contend there are substantial uses for the spark perforated tape which do not result in infringement and argue three legal consequences arise: (1) National's sales of the tape do not make it liable as a contributory infringer under 35 U.S.C. § 271(c); (2) U.S.G. is guilty of misuse because an unspecified portion of the price it charges for every roll of tape is a royalty for use under the patent; and (3) U.S.G. is not entitled to damages based on all sales of tape.

The uses which are said not to involve infringement are as follows: (1) A great quantity of tape is applied with an Ames tool or similar device. During such application, one side of the tape is coated with cement before it comes in

---

17. See American Infra-Red Radiant Co. v. Lambert Industries, Inc. (8th Cir., 1966), 360 F.2d 977, 987, cert. den. 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144.

18. 35 U.S.C. § 102(b).

19. See Julian v. Drying Systems Co. (7th Cir., 1965), 346 F.2d 336, 338.

contact with the wallboard. It is claimed that the perforations are clogged before such contact and therefore do not "permit the escape of air entrapped beneath said strip during its application to said joint. * * *"[20] (2) Some tape is used where there is no joint between adjacent wallboards, *i. e.*, to repair a gouge or crack, and to extend the surface of the wallboard to obtain a close fit around pipes, outlets, fixtures, and the like.

Somewhat similar contentions were advanced on the first appeal, were decided against National, albeit without discussion in the opinion, and were not included among the issues to be decided on remand.

In any event, the record makes it clear that uses under (2) are incidental to the use for which the tape is purchased, and which is protected by the patent, and too insubstantial, relative to the amount of tape sold, to prevent National's liability as a contributory infringer or to be a basis for a claim of misuse. There was testimony that the amount used under (2) "wouldn't exceed the amount of tape that would normally be wasted." When damages are determined, consideration may be given to such uses in accordance with and as may be appropriate under any showing made as to their extent.

The quantity of tape applied by means of the Ames tool or similar device is surely very substantial. But we are not persuaded that when the tape and cement come in contact while the tape is passing through the tool immediately before contact is made with the wallboard, the escape of entrapped air through the perforations in the tape cannot be said to occur "during its application to said joint." We conclude that infringement would result whether the application is made by use of the Ames or similar tool or not.

The judgment appealed from is affirmed.

---

20. The phrase, "during its application to said joint", appears in claims 2, 3, and 4, but not 1 nor 5.