**AIRTEX CORPORATION, Plaintiff, Counter-Defendant,**

v.

**SHELLEY RADIANT CEILING COMPANY, Defendant, Counter-Plaintiff.**

No. 73 C 1523.

United States District Court,
N. D. Illinois, E. D.

April 21, 1975.

George N. Hibben and Arlie O. Boswell, Jr., Hibben, Noyes and Bicknell, Chicago, Ill., for plaintiff.

William A. Marshall and James J. Conlon of Merriam, Marshall, Shapiro & Klose, Chicago, Ill., for defendant.

## DECISION

McMILLEN, District Judge.

Plaintiff as owner of Baran patent 2,818,235 and Beck patent 3,698,475 has sued defendant for infringement of both patents. Defendant contends that both patents are invalid and also that any infringement of the Baran patent was *de minimis*. Defendant also counterclaims for unfair competition, based primarily on the contention that the plaintiff's patents are invalid. The court has taken evidence consisting of testimony in open court, portions of several depositions, and numerous exhibits, followed by post-trial memoranda of the parties.

### The Subject Matter of the Beck Patent is Obvious

We find and conclude that the Beck patent is invalid. This patent covered a method for bonding metal tubing to a metal sheet. The specific product covered by the claims is known in the building industry as a high performance ceiling panel, used for heating and cooling a room. Temperature changes are obtained by running hot or cold water through copper tubing which is soldered to a thin sheet of aluminum. The direct soldering results in a more efficient transfer of heat or cold to a room than can be achieved by the standard "snap-on" panels which are merely held next to the tubes by pressure (Baran patent 2,818,235, *infra*).

The claims of the Beck '475 patent cover a product, not a process, as follows (Plaintiff Ex. 6, cols. 7 and 8):

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

1. A radiant heating-cooling panel constituted of a flat sheet of aluminum less than 0.100 inch thick having copper tubing for the passage of a heating-cooling medium secured by a solder joint to one face thereof in heat transfer relation, said sheet being characterized by substantial flatness and absence of wrinkles, ripples and undulations, or other localized distortions, when viewed from a very flat angle.

2. A radiant heating-cooling panel according to claim 1 wherein the thickness of said aluminum sheet is about 0.040 inch, and said tubing has an inside diameter of the order of one-half inch, and a wall thickness of the order of 0.028 inch.

3. A radiant heating-cooling panel according to claim 1 wherein said solder provides fillets between said tubing and sheet on both sides of the tubing along substantially the entire length of said tubing.

4. A radiant heating-cooling panel according to claim 3 wherein said solder has a composition of about 91 percent tin and 9 percent zinc.

Plaintiff has disavowed any specific novelty in the components of these claims but contends that Beck's combination of them constitutes his invention. This is evidenced by plaintiff's answers filed to defendant's interrogatories 25, 30 and 33, stating:

## INTERROGATORY 25.00

25.00 As to each claim of each patent in suit, identified by quotation from such claim the particular feature or features, if any, therein which are alleged to have been new and patentable at the time of filing the application for the patent.

## ANSWER

25.00 (a) *Beck patent in suit*

. . . At the time of filing the Beck application, all of the features defined by the patent claims in their inventive relationship were new and patentable. A radiant heating and cooling panel *per se* comprising a flat sheet of aluminum less than 0.100 inch thick or 0.040 inch thick was not novel. Copper tubing *per se* having an inside diameter of the order of one-half inch and wall thickness of the order of 0.028 was not novel. Solder *per se* was not novel. A solder *per se* composed of 91 percent tin and 9 percent zinc was not novel. A radiant panel *per se* having substantial flatness and absence of wrinkles, ripples and undulations was not novel. But the combining of the above-named elements for the first time by Beck into a novel, unobvious and unthinkable structural combination to accomplish the new and patentable relationship defined in the claim as entireties constituted the Beck invention.

\* \* \* \* \* \*

## INTERROGATORY 30.00

30.00 As to each claim in issue, state the new result or results, if any, which Plaintiff asserts flows from the combination of elements defined in each claim.

## ANSWER

*As to the Beck patent claims,* the combination of elements defined therein provide for the first time in the commercial use of radiant heating and cooling, high performance ceiling panels which are capable of a long operable life and are not subject to leakage and deterioration due to corrosion, a strong fracture-resistant and heat conductive bond is provided between the copper tubing and a relatively thin, commercially desirable aluminum sheet, and the thin aluminum sheet after the application

of high soldering temperatures to bond the copper tubes to the top surface of the sheet possesses and retains during operation and use a freedom from wrinkles, ripples, undulations and other localized distortions when viewed from a very flat angle. . . .

\*    \*    \*    \*    \*    \*

### INTERROGATORY 33.00

33.00 With respect to the '475 Patent, does Plaintiff contend or assert that the named inventor was the first and original person to provide a high performance radiant panel for use in heating and/or cooling service comprising a thin metal panel less than 0.100 inch thick having a tubing for the passage of a heating-cooling medium being metallurgically bonded or otherwise affixed to one face thereof in heat transfer relationship?

### ANSWER

33.00 Plaintiff does not so contend or assert because the radiant panel broadly described in this interrogatory was not the invention covered by the Beck patent. Beck was the first and original inventor of the high performance radiant panel as defined in the claims of the '475 patent in suit.

\*    \*    \*    \*    \*    \*

The combination covered by the above claims are obvious to persons skilled in the art who, in this instance, are "graduate engineers having experience in the field of heating, ventilating and air conditioning and graduate engineers having experience in the art of metal working and metal joining". See Plaintiff's brief p. 4, citing *U.S. Gypsum Co. v. National Gypsum Co.,* 440 F.2d 510, 513 (7th Cir. 1971). Copper tubing has long been recognized as a superior carrier of hot and cold water, and the advantages of combining it with sheet aluminum are discussed in Collins patent 2,934,917 (Defendant Ex. 422a, cols. 2 and 3). This combination was well known to the inventor and was also mentioned in a treatise copyrighted in 1963 entitled *Introduction to the Utilization of Solar Energy* (Defendant Ex. 367 at pp. 274 and 276).

The mechanical process of soldering copper tubing to sheet aluminum was Beck's primary concern, but his process patent was filed on October 5, 1967 and is not relied upon here. The feasibility of soldering copper tubing to sheet aluminum was known to those skilled in the art (Defendant Exs. 356, 366). Beck's process patent 3,514,834 (Defendant Ex. 455) was issued more than 2 years before his '475 patent. His claims in the '475 patent merely state the result achieved by his '834 process and nothing more.

The sheet aluminum finally utilized by Beck had an alloy coating which was essential for obtaining a proper bond. The inventor's testimony leads us to the firm conclusion that the soldered bond would not be secure on aluminum sheet in the absence of a coating of zinc or alloy with zinc. This specification is not contained in the description of the methods or anywhere else in either patent, however, and it is not claimed.

■ Hence the only novel part of claim 1 (supra, p. 172) was the result of the process, specifically, a panel "characterized by substantial flatness and absence of wrinkles, ripples and undulations, or other localized distortions, when viewed from a very flat angle." We do not believe these descriptive words can be the subject of an enforceable patent. They describe an obvious result which, in actuality, is the same result desired in constructing most ceilings. This is evidenced, for example, by the testimony of R. N. Griffin, Manager of the Soundlock Division of Emerson Electric Co. in Hazelhurst, Georgia. He testified on June 26, 1974, on the question of flatness, as follows (deposition pp. 14–15):

Q In your opinion would these have been acceptable to the trade for in-

stallation along with your acoustical panels?

A That's a hard question to answer without really seeing them installed into a ceiling.

Q Could you explain what you mean by that?

A Because of your varying light situations in a ceiling. Flatness is a relative term anyway. And other than seeing them side by side, I really couldn't give you an honest answer on that.

Q You would have to see how the light struck them?

A I would have to see how the light struck our panels versus their panels and vice versa.

Q Have you seen those panels installed since that time?

A No.

The visual test of the characteristics of the panel, consisting of an admonition to view the result from a "very flat angle", is not sufficiently precise, even if it was intended to describe the best mode of carrying out the invention. No witness defined a very flat angle or the lighting conditions for viewing, and the inventor cannot be permitted to leave these criteria to the discretion of all those skilled in the art. Nor can he leave to them the determination of "substantial flatness". All of these characteristics can be precisely defined; the witness Dale Greiner, for example, testified to a table for measuring flatness (deposition p. 51). If these criteria are eliminated, the balance of claim 1 is admittedly obvious.

All of the other claims quoted above (p. 172) incorporate claim 1 either directly or indirectly, and claim 3 adds the presence of solder fillets on both sides of the tubing. A fillet is a narrow band or strip, *inter alia*. Thus claim 3 is nothing more than a description of the normal result of the soldering process, as described in the patent itself (col. 5, pp. 61, 66), and is neither novel nor distinctive. Plaintiff does not

claim that defendant infringed claim 3 as distinguished from claim 1, and no evidence was adduced to this effect. We therefore assume that the presence or absence of fillets is not distinctive or material to the case at bar.

### The Beck Patent Lacks Specificity

This brings us to another deficiency in Beck's '475 patent, failure to satisfy specificity requirements of 35 U.S.C. § 112. This section requires in part:

§ 112. *Specification*

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invetion.

The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

\* \* \* \* \* \*

Beck's '475 patent does not specify the manner and process of making and using his invention so that one skilled in the art can carry it out. He discloses the basic components of his product, but not the detailed specifications. No disclosure is made of the essential zinc or alloy coating which proved necessary for a proper bond, yet Beck thought his development had been frustrated when Alcoa ceased manufacturing its solder sheet #81 in 1964. (Deposition p. 62). A proper bond could be achieved, according to the patent, with ribbon or wire solder, a metallic powder, or a "thermosetting resin adhesive" (Col. 2, 1.28–33). The reader is left to his own knowledge concerning which of these alternatives to choose, and, so far the evidence shows, only the use of a wire solder was reduced to practice by the

inventor. Furthermore, the essential quality of "substantial flatness" is to be obtained in an undefined proportion of panels by "a simple straightening operation" (col. 6, 1.57).

In short, one skilled in the art would need to go through the same process of trial and error which Beck followed in order to reach his result. The defendant's own subcontractors either knew how to achieve a satisfactory bond between .040 aluminum sheet and copper tubing or were able to develop a process of their own without undue experimentation (Deposition of Ross Cortese taken April 3, 1974 at pp. 60–63; deposition of Dale Greiner taken April 5, 1974, pp. 6, 10). It took Greiner only 3 or 4 days of work to develop this (deposition p. 16). Plaintiff itself asserts (brief p. 13) that a person skilled in the art would know that the aluminum sheet must be clad with a zinc alloy to afford a proper bond for the soft solder, and that it was necessary to paint the exposed face of the panel in order to provide maximum radiation of heat and cold. If these details were well-known to one skilled in the art, then the disclosures of the patent itself are equally well-known, and it is void for obviousness. If the foregoing specifications were not well-known, Beck failed to disclose the best mode for carrying out his invention as required by 35 U.S.C. § 112.

*The Plaintiff Put the Subject Matter of the Beck Patent on Sale before January 28, 1965*

We also find and conclude that the plaintiff offered for public sale high-performance ceiling panels of the type covered by Beck's '475 patent more than a year before the critical filing date. The Beck '475 application was filed on March 3, 1970, but the parent application was filed on January 28, 1966. The parties agree that the 1966 date is the critical one.

Beck's employer, the Stolle Corporation, reduced the process to practice by producing twelve high performance ceiling panels and shipping them to plaintiff in November 1963. They were made from a zinc coated aluminum sheet manufactured and sold by Alcoa as its solder sheet #81. The method by which these panels were made was different from the process described in the '475 patent, but the subject matter was the same. These panels were tested by plaintiff in September 1964, following which the product was offered for sale to the public. The only perceptible difference between these 12 panels and the ones subsequently produced for plaintiff's customer is that Alcoa ceased producton of sheet #81 and a different aluminum sheet was used. It had an alloy coating consisting of 2½% zinc.

Plaintiff's salesman Nierzwicki offered a high-performance panel of this type to the Elgin State Hospital in January 1963. Plaintiff published an advertising brochure containing detailed drawings of the high performance panels dated 10–17–63 (Defendant Ex. 304a). The hospital architects included such panels in their specifications of March 1964 (Defendant Ex. 539, par. 6e). A purchase order for $93,000 was accepted by Nierzwicki by a letter to the contractor dated October 9, 1964 in which he wrote: "Special panels furnished by Airtex, Incorporated will be manufactured to exact size shown on drawings, with copper tubes bonded to aluminum sheet . . . Shop drawings will begin this week, together with complete material orders, which have already been placed . . . ". (Defendant Ex. 613). Such panels were then ordered by plaintiff from the Stolle Corporation which acknowledged the order on October 20, 1964 (Defendant Ex. 56). It produced six more panels by January 15, 1965. Since plaintiff negotiated commercial sales on the basis of existing samples and detailed specifications, we find and conclude that the subject matter of the invention was "on sale" prior to January 28, 1965 within the meaning of 35 U.S.C. § 102(b). *Dart Industries, Inc. v. E. I. DuPont De Nemours & Co.*, 489 F.2d 1359 (7th Cir. 1973), cert. den. 417 U.S.

933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974).

There is ample evidence of similar transactions with other purchasers prior to January 28, 1965 (Defendant Exs. 63a and 590). Even though the inventor Beck used a different method to make the original high performance panels and did not perfect his manufacturing process until May 1965, this does not negate a reduction to practice under the product patent which is involved in this litigation. The plaintiff would not have advertised for and accepted orders for high performance panels, and the inventor would not have agreed to produce them in quantity, merely on the hope that they would be invented before the delivery date. As was said by the court in *Dart Industries, Inc.* (supra) at page 1365:

> We find no merit in the argument that the product was not on sale because Bradt did not have a sufficient inventory on hand to enable him to make immediate delivery in commercial quantities. The cases which plaintiff cites to support this argument dealt with the question whether selling activity short of a completed sale was sufficient to invoke the bar. These cases are not followed in this circuit, see *Wende v. Horine*, 225 F. 501, 505 (7th Cir. 1915). The record before us discloses completed sales before the critical date as well as other selling activity. In our opinion, the patented product need not be on hand in commercial quantities for it to be "on sale" within the meaning of § 102 (b).

### The Baran Patent

■ Defendant does not contend that the Baran '235 patent is invalid but denies any infringement. We find and conclude that Plaintiff's Ex. 196 does infringe and that the claimed distinction between this exhibit and claim 2 of the patent is of no substance. However, the defendant made only six panels before the patent expired on December 31, 1974. The infringement is therefore *de minimis* and does not justify the awarding of attorneys' fees to plaintiff.

### This Is Not an "Exceptional Case" but Defendant is Entitled to Relief Under F.R.C.P. 37

■ Defendant contends that the plaintiff's conduct, aided and abetted by its attorneys, entitles defendant to attorneys' fees under 35 U.S.C. § 285. Defendant's argument on this point is based at the outset on plaintiff's failure to disclose the existence of the 12 panels made and shipped to the plaintiff by the Stolle Corporation in November 1963. This did not constitute a "sale", and the panels were experimental in the sense that Stolle submitted them pursuant to plaintiff's request to determine if such a panel could be successfully produced. Plaintiff's subsequent sale of this type of panel for the Elgin State Hospital job and the other two jobs prior to January 28, 1965 was not participated in by Stolle except to the extent of accepting an order from plaintiff to produce the panels. Since Stolle did not actually produce or deliver the panels to a job site until after Beck had perfected his manufacturing process in May 1965, knowledge of the sale is not imputed to the applicant before January 28, 1965. Furthermore, the *Dart Industries* decision was not published until September 1973. Therefore we do not find that the plaintiff's conduct, or that of the patent applicant, has been clearly shown to constitute fraud on the Patent Office.

On the other hand, plaintiff's answers to defendant's interrogatories 8 and 9.60, 9.70 and others do not disclose that these panels were shipped by Stolle to plaintiff in November 1963 which was a reduction to practice using Alcoa's solder sheet #81. These facts were discovered by defendant's attorneys after the answers to interrogatories were filed, as was certain other historical information concerning the plaintiff's disclosure of the subject matter of the patent (Interrogatories 3.20, 3.30 and 3.40). Although

plaintiff may not have had the information contained in the Stolle Corporation's files when it answered the interrogatories, it should have disclosed the information possessed by its own personnel or files.

■ The plaintiff's failure to answer the interrogatories fully and completely could have altered the outcome of this case, but for defendant's subsequent discovery work, as occurred in *Strassheim Co. v. Gold Medal Folding Furniture Co.*, 477 F.2d 818 (7th Cir. 1973). Therefore plaintiff should bear the expenses incurred by defendant in investigating the matters which were not disclosed in plaintiff's answers to interrogatories filed January 15, 1974. This decision is pursuant to F.R.C.P. 37, not necessarily under 35 U.S.C. § 285, however.

### Unfair Competition

■■ Since plaintiff's Baran patent was valid and since there is no evidence that it knew or believed that its Beck patent was invalid, it follows that plaintiff's attorneys were justified in sending notification letters to defendant's customers between February and October 1973. A good faith belief that a patent is being infringed, particularly when promptly followed up by filing a lawsuit in good faith, is a defense to a charge of unfair competition. *Virtue v. Creamery Package Mfg. Co., et al.*, 227 U.S. 8, 37–8, 33 S.Ct. 202, 57 L.Ed. 393 (1913); *Applied Biochemists, Inc. v. A & V Inc.*, 353 F.Supp. 949 (E.D.Wis.1973). Aside from the claim of infringement, the letters in question do not contain any other actionable statements (Defendant Exs. 65 through 82). Furthermore, no other evidence of plaintiff's alleged unfair marketing practices is contained in the record, and the defendant's First Counterclaim fails.

It is therefore ordered, adjudged and decreed that judgment is entered in favor of defendant on the Complaint and in in favor of the plaintiff on the First Counterclaim.